```
1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
2                          SOUTHERN DIVISION


3

UNITED STATES OF AMERICA
4
VS.                              CRIMINAL NO.  1:18CR121
5

6   AMBROSE DEJUAN NELSON


7


8

9                   TRANSCRIPT OF SENTENCING HEARING

10             BEFORE THE HONORABLE HALIL S. OZERDEN
                 UNITED STATES DISTRICT JUDGE
11
                       MARCH 15, 2019
12                   GULFPORT, MISSISSIPPI

13   APPEARANCES:

14   FOR THE GOVERNMENT:
       KATHLYN VAN BUSKIRK, ESQUIRE
15     U.S. ATTORNEY'S OFFICE – GULFPORT
       1575 20TH AVENUE
16     GULFPORT, MISSISSIPPI  39501

17
     FOR THE DEFENDANT:
18     JAMES L. DAVIS, III, ESQUIRE – CJA
       P.O. BOX 1839
19     GULFPORT, MISSISSIPPI  39502
              AND
20     ROSS R. BARNETT, JR., ESQUIRE
       BARNETT LAW FIRM – JACKSON
21     1911 DUNBARTON DRIVE
       JACKSON, MISSISSIPPI  39216
22
     REPORTED BY:  SHERRI L. PENNY, RPR, FCRR
23                 2012 15TH STREET, SUITE 403

24   _____

25                 GULFPORT, MISSISSIPPI  39501
                       (228)563–1751
```

1
1          **THE COURT:**  This is case number 1:18-121, United

2    States versus Ambrose DeJuan Nelson, scheduled for sentencing.

3    Would counsel please make their appearances.

4          **MS. VAN BUSKIRK:**  Good morning, Your Honor.  Kathlyn

5    Van Buskirk on behalf of the government.

6          **THE COURT:**  Good morning.

7          **MR. DAVIS:**  Jim Davis, Your Honor.  And I'm hear on

8    behalf of Mr. Nelson, and Ross Barnett, Junior, is here with me

9    as co-counsel.

10         **THE COURT:**  All right.  Good morning, Counsel.

11         **MR. DAVIS:**  And Mr. Nelson is present.

12         **THE COURT:**  Good morning.  Ms. Van Buskirk, pursuant

13   to the Crime Victims' Rights Act, are there any victims of this

14   offense?

15         **MS. VAN BUSKIRK:**  No, Your Honor.

16         **THE COURT:**  Has the government received the

17   presentence report and any addendum and had a chance to review

18   them?

19         **MS. VAN BUSKIRK:**  I did, and there's no objection on

20   behalf of the government.

21         **THE COURT:**  All right.  Mr. Davis, or Mr. Barnett,

22   either of you, did you receive the presentence report and any

23   addenda and have a chance to review them with your client?

24         **MR. DAVIS:**  Yes, sir, Your Honor.

25         **THE COURT:**  Were you able to explain it to your

1    client and answer any questions he had about them?

2              **MR. DAVIS:**  Yes, Your Honor.

3              **THE COURT:**  And did he understand the presentence

4    report and any addendum?

5              **MR. DAVIS:**  Yes, Your Honor.

6              **THE COURT:**  Are there any objections?

7              **MR. DAVIS:**  Yes, Your Honor.

8              **THE COURT:**  I know there were some written ones

9    submitted.  Why don't you just state very briefly for the

10   record what they are, and then I will see if the government has

11   any evidence or argument to offer.

12             **MR. DAVIS:**  Judge, the biggest objection my client

13   has, and he's been emphatic about this to me and Mr. Barnett

14   both, is that he denies any involvement with Mr. Washington or

15   Mr. Taylor, and Mr. Washington and Mr. Taylor's drug

16   transactions.  We have pointed out that the discovery and the

17   evidence does have text messaging between him and Washington.

18   Also, there is an alleged -- some wire transfers.  And in

19   particular, I believe one from, allegedly, him directly to

20   Mr. Washington, but with knowledge of that, our client is still

21   emphatic that he denies any contact whatsoever with Washington

22   and Taylor.

23             **THE COURT:**  All right.

24             **MR. DAVIS:**  And, of course, with that, that would

25   make him not involved with, of course, the large amount of

1    methamphetamine that Taylor and Washington were involved in.

2            Also, the firearm.  The firearm -- I believe the

3    firearm that they're alleging in the presentence report is a

4    firearm that was a .45 caliber Glock, I believe, that was found

5    in Taylor's apartment.  My client emphatically says -- of

6    course, since he is denying everything with Taylor, he knows

7    nothing about that pistol, that gun.  And that is a little

8    far-reaching when they always -- when they find one on a

9    codefendant and they don't actually find any guns on the

10   individual defendant, that that enhancement applies against

11   him.

12           Also, I made an objection in the presentence report,

13   and I hope the Court kind of grasps what this one is.

14   Methamphetamine that is pure, the defendant -- when they look

15   at the sentencing guidelines, it's kind of enhanced because if

16   you have ice, or allege ice is what they have, of course the

17   guidelines is a lot higher than if it's just regular

18   methamphetamine.

19           **THE COURT:**  Right.

20           **MR. DAVIS:**  And so that same theory, the purity or,

21   you know, of the particular narcotic or ice, is used to claim

22   it had to be imported, so he gets another two-level

23   enhancement.  As in the presentence report, I believe it was

24   paragraph -- I didn't write down the number, but the Court is

25   aware he did get a two-level enhancement for that.

1          THE COURT:  Yes.

2          MR. DAVIS:  So is that -- I think that's kind of a

3     theory of double counting for the same wrongdoing.  Having this

4     pure narcotic, you get a higher level, and then you turn around

5     and now they're claiming since it's a pure narcotic you get a

6     two-level enhancement.  It's kind of like they're double

7     hitting you twice in the guidelines for the same bad act.  And

8     I just have an objection for that reason.

9          THE COURT:  Well, I understand that may be a

10    philosophical objection, but that's the guidelines.  That's the

11    way they're written, so...

12         MR. DAVIS:  I'm just saying that --

13         THE COURT:  I understand.

14         MR. DAVIS:  -- understand, that's one objection I've

15    kind of developed in my own mind.  For a long time I said

16    there's no way they can claim all this stuff is found, and that

17    none of it is being manufactured in the United States.  But

18    since I've lost that motion about three or four times, and the

19    government's agents, they finally have convinced me that it

20    must be coming from outside the country, but I still think this

21    is -- I still think they kind of find of philosophically, as

22    you say, Your Honor, they are kind of double counting for the

23    same wrongful act.

24              And then, again, on the leader and organizer, that

25    relies heavily on Washington's statements about this young man,

1   which, again, Mr. Nelson adamantly denies.  And I think that

2   kind of goes through the basis of all our objections, Your

3   Honor.

4          **THE COURT:**  Well, let me inquire, does the government

5   have any evidence to offer on the objections?

6          **MS. VAN BUSKIRK:**  Yes, Your Honor.  The government

7   would call Agent Will Anderson.

8          **THE COURT:**  All right.  Agent Anderson, come forward,

9   please.  If you would, sir, place your left hand on the Bible,

10  raise your right hand, and take the oath here.

11                          **WILL ANDERSON,**

12  **having first been duly sworn, testified as follows:**

13         **THE COURT:**  Sir, please have a seat in the witness

14  box.  You'll see the microphone there in front of you.  I need

15  you to speak slowly so the court reporter can type down

16  everything you're saying.  She can't type two people talking at

17  once, so you have to let the lawyers finish talking before you

18  start answering.  And you must verbalize all answers yes or no.

19  She can't type a shake or nod of the head or an uh-huh or

20  nuh-uh.  Do you understand that, Sir?

21         **THE WITNESS:**  Yes, sir.

22         **THE COURT:**  You may begin, Counsel.

23         **MS. VAN BUSKIRK:**  Thank you, Your Honor.

24                        **DIRECT EXAMINATION**

25  BY MS. VAN BUSKIRK:

**W. Anderson - Direct**

1   Q.  Agent Anderson, were you the investigator in a case

2   involving Mr. Tharon Taylor, a Mr. Washington, along with

3   Ambrose DeJuan Nelson?

4   A.  Yes, I was.

5   Q.  And during your investigation, did you get the cooperation

6   of Mr. Washington?

7   A.  That is correct.

8   Q.  And what did you learn during your cooperation of

9   Mr. Washington?

10  A.  Through Mr. Washington's cooperation, early on in the

11  investigation, he identified his source of supply as Ambrose

12  DeJuan Nelson.  He stated Mr. Nelson was his cousin, and that

13  Nelson had contacted him to transport methamphetamine from

14  Nelson to Mr. Tharon Jamell Taylor in Pascagoula.

15  Q.  Was there a relationship between these individuals and

16  Mr. Tharon Taylor?

17  A.  Yes, they were loosely related.  I believe Mr. Washington

18  identified Taylor as his step-dad's nephew.

19  Q.  When did this occur?

20  A.  In the summer of 2017.  Approximately, between June and

21  August.

22  Q.  And how many trips did Mr. Washington state that he took

23  from Texas to Mississippi?

24  A.  Mr. Washington stated he took seven or eight trips, which

25  at least seven of those were substantiated by LPR data.

W. Anderson - Direct

1    Q.  And did he ever bring the proceeds of those narcotics back

2    to Mr. Nelson?

3    A.  Yes.

4    Q.  And did he state anything about Mr. Nelson's involvement

5    with coming to Mississippi to deliver narcotics?

6    A.  Yes.  Mr. Washington stated in an interview that if he was

7    unable to transport the narcotics or the currency for

8    Mr. Nelson, that Nelson would make the trip himself.

9    Q.  And were you able to talk to Mr. Washington about Mr.

10   Nelson's physical location in Dallas, Texas?

11   A.  Yes, I was.  When we began to discuss Mr. Nelson and try

12   to positively identify him, he described the portion of town of

13   where Mr. Nelson's apartment was located.  I then showed him,

14   utilizing Google Maps, the apartment complex, and he positively

15   identified the apartment complex.

16   Q.  And was he -- what information did he state he ever saw at

17   the apartment complex involving narcotics transactions?

18   A.  He stated one time that during one of the trips when he

19   was actually supposed to pick up the narcotics, that Mr. Nelson

20   did not have possession of the narcotics yet.  And he and

21   Washington waited, and I'm not sure if it's the same apartment

22   complex as Mr. Nelson resided or not, but they waited in the

23   parking lot of the apartment complex where Mr. Nelson met with

24   a Hispanic male and provided him approximately $3,000 in cash

25   for an unidentified amount of methamphetamine.

**W. Anderson – Direct**

1   Q.   During your debriefing with Mr. Washington, did he have

2   any information regarding MoneyGram?

3   A.   Yes.   Mr. Washington stated that Mr. Taylor would pay

4   Nelson for partial payments, or "fronts" as they're sometimes

5   called, for the narcotics through Wal-Mart MoneyGram.

6   Mr. Washington also stated he sometimes received payment for

7   his courier services through Wal-Mart MoneyGram.

8   Q.   And what did you do with this information upon learning

9   about MoneyGram?

10  A.   I subpoenaed Wal-Mart MoneyGram, the actual service.   I

11  believe it's actually MoneyGram, separate from Wal-Mart.   But

12  anyway, I subpoenaed their records for Mr. Nelson during that

13  time period and was able to substantiate Mr. Washington's claim

14  that he was receiving transactions from Mr. Nelson.   And,

15  specifically, I asked him about a transaction on June 28, 2017,

16  wherein MoneyGram's records showed that Mr. Nelson paid $1,000

17  to Washington, and Mr. Washington stated that that payment was

18  for his courier services for transporting methamphetamine.

19  Q.   In any of the documents that you received from your

20  subpoena, did it show that Mr. Nelson, in fact, used his

21  driver's license while using MoneyGram?

22  A.   Yes.

23  Q.   And that was a copy of his driver's license?

24  A.   It wasn't a photographic copy, but it listed all the

25  information that was listed on his driver's license, such as

**W. Anderson - Direct**

1    the license number, the address, and things of that nature.

2    Q.   What about any females, were any females found to be on

3    MoneyGram depositing money for Mr. Nelson?

4    A.   Mr. Washington stated that Taylor, Mr. Taylor did not send

5    the payments to Mr. Nelson directly, that he would use females,

6    mostly female family members to send the money back.   That

7    information was corroborated, as several of Mr. Taylor's

8    relatives were found to be sending money to Mr. Nelson via the

9    same Wal-Mart MoneyGram service.

10   Q.   Based on your subpoenaed information, how many females

11   were you able to identify sending money back to Mr. Nelson?

12   A.   Approximately four or five.

13   Q.   Okay.   And Mr. Washington told you there was more than one

14   individual female sending money back for the narcotics?

15   A.   That's correct.

16   Q.   Okay.   And during your investigation, did you ever seize

17   any cell phones from Mr. Washington and Mr. Taylor?

18   A.   Yes.

19   Q.   And what is of significance involving Mr. Nelson and those

20   cell phones?

21   A.   Mr. Washington gave consent, written consent for us to

22   search his cell phone.   During the search of his cell phone, he

23   had a contact listed under the name "Cuz," which he advised me

24   was an a known alias of Mr. Nelson.   Mr. Taylor also had six

25   phones on his person during his arrest.   And one of those

**W. Anderson - Direct**

1    phones was the same phone number Mr. Washington gave for Mr.

2    Nelson, and it was also, I believe, saved under the name "Cuz."

3              Mr. Washington had several text messages between him

4    and that phone number.  One of them was shortly after his

5    arrest stating, Cuz, I just shook free on an aggravated

6    trafficking charge, we can't talk on the phone, they went

7    through it, got everything, bro, move around, don't sit still.

8    He explained that to me as he was warning his cousin that he

9    had just been arrested.

10   Q.  Did you try to subpoena the subscriber information on that

11   phone?

12   A.  Yes, I did.

13   Q.  And were you able to make any determination that that was

14   Mr. Nelson's phone?

15   A.  I was not.  There was no subscriber information listed for

16   that phone number.

17   Q.  And during your investigation, did you learn about Mr.

18   Nelson being shot at some point?

19   A.  Yes.  Mr. Washington stated that at some point in 2016 or

20   '17, Mr. Nelson owed approximately $30,000 to an unknown

21   Mexican supplier in Texas.  And he met with that unknown

22   supplier in West Texas where he was shot, left for dead, and

23   his vehicle was supposedly burned.

24   Q.  And were you able to see any of these possible wounds that

25   he received from the shooting during your investigation?

**W. Anderson - Direct**

1   A.   Yes.  When Mr. Nelson was arrested, he had several scars

2   on his -- I believe it's his left arm.  I tried to ask him what

3   it was from, and he refused to elaborate.

4   Q.   Did you have an opportunity to talk to Mr. Nelson's parole

5   officer in Texas?

6   A.   I did.

7   Q.   And what did you learn from that conversation?

8   A.   Shortly after Mr. Nelson's arrest, and actually during the

9   early investigation into Washington and Taylor, I learned that

10  Mr. Nelson had absconded his probation, and at the time I had

11  originally contacted his probation officer had an NCIC want for

12  a probation violation.

13  Q.   And the methamphetamine that was seized during the stop of

14  Mr. Washington, was that sent to a crime lab?

15  A.   It was.

16  Q.   And what was the results of that crime lab?

17  A.   It was sent to the DEA Crime Lab, and they approximate

18  that it was 100 percent pure.

19  Q.   And are you aware of any super labs in the United States

20  that are able to make that purity of methamphetamine?

21  A.   Not to my knowledge.

22  Q.   And going back to the search of Mr. Tharon Taylor's

23  apartment, what was located in that apartment?

24  A.   Scales, various cutting agents, and a firearm.

25  Q.   And is that the same apartment in which Mr. Washington was

1   supposed to deliver the methamphetamine for Mr. Nelson?

2   A.   That's correct.

3          **MS. VAN BUSKIRK:**  One moment, Your Honor.

4          **THE COURT:**  Yes.

5          **MS. VAN BUSKIRK:**  Government tenders, Your Honor.

6          **THE COURT:**  All right.  Cross-examination?

7          **MR. DAVIS:**  Yes, Your Honor.

8                         **CROSS-EXAMINATION**

9   BY MR. DAVIS:

10  Q.  Mr. Anderson, you indicate that Washington claimed he went

11  to Texas on numerous occasions?

12  A.  Mr. Washington stated he was from Texas.  He lived in the

13  Dallas area.

14  Q.  Do you have any other witnesses that corroborate

15  Mr. Washington's story about him having contact with Mr. Nelson

16  in the State of Texas?

17  A.  No, sir.

18  Q.  Do you have any type of gas receipts, hotel bills,

19  anything that corroborate Mr. Washington's story of his

20  activities in the State of Texas?

21  A.  No, sir.

22  Q.  And in fact, Mr. Taylor, did y'all take a statement from

23  Mr. Taylor?

24  A.  Mr. Taylor did not cooperate.

25  Q.  And so he did not corroborate Mr. Washington's allegations

**W. Anderson - Cross**

1   either; is that correct?

2   A.  That's correct.

3   Q.  So it's basically Mr. Washington's story standing by

4   itself?

5   A.  Several of his statements were corroborated.

6   Q.  Well, you also indicate that there were some women that

7   allegedly put some money in the mail to Mr. -- or wired some

8   money to Mr. Nelson; is that correct?

9   A.  Yes, sir.

10   Q.  But who is telling them to wire that money to Mr. Nelson?

11   A.  I'm unaware, sir.

12   Q.  Was it Mr. Taylor?  I think that's where the money was

13   allegedly coming from; is that correct?

14   A.  Allegedly.

15   Q.  And so if there's any wired money, that would be under

16   Mr. Taylor's directions and orders; is that correct?

17   A.  Yes, sir.

18   Q.  And -- okay.

19        Court's indulgence.

20        **THE COURT:**  Yes.

21   BY MR. DAVIS:

22   Q.  You indicate that there was a gun found in Mr. Taylor's

23   apartment; is that correct?

24   A.  Yes, sir.

25   Q.  And where was that gun found?

1    A.   I believe it was in the first bedroom to the left.

2    Q.   But as far as that gun goes, you have nothing whatsoever

3    that connects that gun directly to Mr. Nelson, do you?

4    A.   No, sir.

5    Q.   And Taylor didn't give you a statement or anything about

6    the gun, did he?

7    A.   No, sir.

8    Q.   And you have no proof of Mr. Taylor using this particular

9    gun in drug transactions?

10   A.   No, sir.

11           **MR. DAVIS:**  Nothing further, Your Honor.

12           **THE COURT:**  All right.  Any redirect?

13           **MS. VAN BUSKIRK:**  No, Your Honor.

14           **THE COURT:**  Agent Anderson, you may step down.  Thank

15   you for your time.

16           Does the government have any other evidence to offer?

17           **MS. VAN BUSKIRK:**  No, Your Honor.  The government

18   rests.

19           **THE COURT:**  Mr. Davis, any evidence on behalf of the

20   defendant?

21           **MR. DAVIS:**  Probably not, Your Honor, but can I talk

22   to my client for one second?

23           **THE COURT:**  Sure, go ahead.

24           **MR. DAVIS:**  Judge, we rest.

25           **THE COURT:**  All right.

1          **MR. BARNETT:**  I'd like for him to say that he doesn't

2     care to testify.

3          **MR. DAVIS:**  Oh, okay.

4          **MR. BARNETT:**  Your Honor, we'd like to be on the

5     record with our client that he does not choose to testify.

6          **THE COURT:**  All right.  Mr. Nelson, raise your right

7     hand and take the oath, sir.

8               (Oath Administered)

9          **THE COURT:**  Mr. Nelson, have you conferred with your

10    attorneys about whether or not to testify at this hearing?

11         **DEFENDANT:**  Yes, I have.

12         **THE COURT:**  And were you able to ask your attorneys

13    any questions you may have had about that subject?

14         **DEFENDANT:**  Yes, I was.

15         **THE COURT:**  Did you understand their answers?

16         **DEFENDANT:**  Yes, I did.

17         **THE COURT:**  Do you understand that you do have a

18    right to testify at this hearing if you wish to do so, do you

19    understand that?

20         **DEFENDANT:**  Yes, I do.

21         **THE COURT:**  Of course, if you do do that, then you're

22    going to be subject to cross-examination by the government, you

23    understand that?

24         **DEFENDANT:**  Yes, sir.

25         **THE COURT:**  But you do not have to testify, it's

1    entirely up to you, do you understand that?

2                    **DEFENDANT:**  Yes, sir.

3                    **THE COURT:**  Do you understand your right to testify?

4                    **DEFENDANT:**  Yes, sir.

5                    **THE COURT:**  And are you telling me it is your own

6    personal knowing, intelligent and voluntary decision not to

7    testify in this case?

8                    **DEFENDANT:**  Yes, it is.

9                    **THE COURT:**  It's not something your attorneys talked

10   you into, or threatened you with, or forced you not to do?

11                   **DEFENDANT:**  I choose not to, Your Honor.

12                   **THE COURT:**  Thank you.  You may be seated.

13                   Let me hear, then, any argument, if there's no

14   further evidence, any argument on behalf of the government.

15                   **MS. VAN BUSKIRK:**  Your Honor, the government would

16   just show that the addendum -- we would rely on the information

17   provided by the probation officer's comments as to each of the

18   objections.  The government feels that Mr. Nelson should be

19   held accountable for his actions involving the conspiracy

20   involving Mr. Washington and Mr. Taylor.  The government has

21   shown by a preponderance of the evidence, Your Honor, that he

22   was involved.  We have Mr. Washington's statements that have

23   only been corroborated, and nothing shown that Mr. Washington

24   was lying to the government during his debriefing.  He provided

25   information that he was traveling on several occasions from

1    Texas to Mississippi with narcotics on behalf of Mr. Nelson to

2    deliver to Mr. Taylor.  He was also able -- Agent Anderson was

3    also able to corroborate that not only was Mr. Washington only

4    delivering it, but there was also text messages in his phone

5    with the number that was also in the phone of Mr. Tharon

6    Taylor.  And then he was able to further corroborate the

7    MoneyGrams, money being used and sent from Mr. Nelson to

8    Mr. Washington at one point, along with several females, in

9    which you heard there was at least more than two females

10   involved in sending money back to Mr. Nelson.

11        As to the amount, I feel that he should be held

12   accountable for all of the methamphetamine delivered by

13   Mr. Washington.  He never said that it was any other individual

14   but Mr. Nelson who was the source of supply for the

15   methamphetamine he was bringing for Mr. Taylor.

16        As to the gun enhancement, Your Honor, this was

17   obviously foreseeable, I believe, from Mr. Nelson's point of

18   view, that the individual, Mr. Taylor, would have a gun in

19   connection with this large amount of methamphetamine that he

20   has being delivered to his house.  I believe it's foreseeable

21   from Mr. Nelson's point of view.

22        As to the offense level involving the

23   methamphetamine, you heard the crime lab submission, it was

24   100 percent pure methamphetamine, and according to Agent

25   Anderson, that he is not aware of any super labs that are able

1    to produce in the United States this amount of methamphetamine

2    at this purity.  And therefore, we know that it did come from

3    Mexico, along with all of the connections that Mr. Nelson had

4    with individuals in Texas, it just seems to -- from the

5    testimony of Agent Anderson, that there's cartel dealings with

6    Nelson and individuals who were providing him the narcotics.

7                As to the role enhancement, Your Honor, as to the

8    four-level enhancement, I believe the government has shown that

9    there are five or more individuals involved in this, and we

10   only have to show Mr. Nelson was directing one individual,

11   which would be Mr. Washington, to go back and forth, deliver

12   the narcotics, bring the money back and forth on occasions.

13   But the government would show that Mr. Nelson was one of those

14   members, Mr. Washington, Mr. Taylor.  And then we have the two

15   females, two or more females that we know involved in the

16   MoneyGram transactions.

17               So therefore, I believe the four-point enhancement is

18   justified, Your Honor.

19          **THE COURT:**  All right.

20          **MS. VAN BUSKIRK:**  Thank you.

21          **THE COURT:**  Mr. Davis, any argument?

22          **MR. DAVIS:**  Yes, sir, I'll be real brief.  As far as

23   -- I'll start at the end with the leadership role.  It sounds

24   like if anybody is a leader, Mr. Taylor is.  And he's the one

25   directing and controlling women running and depositing money

1   for him and everything else.  It doesn't sound like Mr. Nelson

2   is a leader or supervisor at all.  So I don't think that

3   four-point enhancement possibly would apply to this individual.

4        And then the gun, it was found in Taylor's apartment,

5   but there's no proof whatsoever that it was ever even in

6   Taylor's possession.  It was just found in his apartment.

7   Also, there's no proof whatever of this gun being used or

8   related or anything in connection with drugs.  It was just a

9   pistol found in Taylor's apartment that we actually don't even

10  have in Taylor's control or possession.  So we don't feel the

11  gun enhancement should apply, Your Honor.

12       And again, I think the Court has to look to whether

13  they believe Mr. Washington because that entire base level of

14  the drugs and everything greatly relies on his almost

15  uncorroborated testimony, even though they do have the text

16  messaging and the MoneyGrams.

17       **THE COURT:**  All right.  This matter is before the

18  Court on the objections to the presentence report lodged by the

19  defendant.  I've considered the record in this case, the

20  presentence investigation report and addendum, and the record

21  here today.  The Court must make findings by a preponderance of

22  the evidence with respect to the proper calculation of the

23  guidelines in this matter.

24       Here, much of the evidence is based upon the case

25  agent's investigation and the cooperation obtained from

1    Mr. Washington, who was the defendant's cousin.  Of course, a

2    lot of that, or some of that, has been corroborated by other

3    means.

4           The evidence the Court finds to be credible and

5    supported by findings based upon the testimony in this case are

6    that the defendant was involved with Mr. Washington and

7    Mr. Taylor.  There's been no showing that Mr. Washington was

8    lying or that he was otherwise not credible.  Some of the

9    things he told the agents were corroborated by way of the

10   subpoenas to MoneyGram.  Some of the transactions there matched

11   up.  They matched up -- were able to corroborate the number of

12   trips.  I think Mr. Washington said seven to eight, and the

13   agent testified they were able to corroborate seven of those

14   trips.  And they were also able to corroborate contact between

15   -- provide evidence of contact between the co-conspirators,

16   Mr. Washington and Mr. Taylor, with the defendant based upon

17   phone numbers found in both of those individuals' phones and

18   on -- based upon the fact that he was labeled as "Cuz" in both

19   phones, and that was known to be one of his monikers.

20          Moreover, there's a text message that is from the

21   time of Mr. Washington's stop warning or advising "Cuz" that he

22   had been stopped and advising him to be aware of that.

23          So the credible testimony before the Court supports a

24   finding by a preponderance of the evidence that Mr. Washington

25   was being forthcoming and truthful with the agent, and the

1   agent gave no indication that he had any reason not to believe

2   anything Mr. Washington was telling him.  So the Court finds

3   that evidence and testimony credible, and it guides the Court's

4   resolution of the legal questions regarding which enhancements

5   would properly apply.

6        The first matter is, of course, the doctrine of

7   relevant conduct.  And under the doctrine of relevant conduct,

8   Section 1B1.3 of the guidelines, finds relevant conduct as, all

9   acts and omissions committed, aided, abetted, counseled,

10  commanded, induced, procured, or willfully caused by the

11  defendant; and, in the case of a jointly undertaken criminal

12  activity, a plan, scheme or enterprise, all acts and omissions

13  that were within the scope of the jointly undertaken criminal

14  activity, in furtherance of that activity, and reasonably

15  foreseeable in connection with that activity.

16       Of course, this is a Possession with Intent to

17  Distribute conviction.  That was the count of conviction to

18  which the defendant plead guilty.  So he acknowledged, at least

19  with respect to some of this behavior, that he was engaged in

20  possession with intent to distribute narcotics.  And the record

21  supports the conclusion, and the Court so finds, that he was

22  involved in jointly undertaken criminal activity with

23  Mr. Washington and Mr. Taylor.

24       For conduct that constitute a common plan or scheme,

25  the conduct must be substantially connected by at least one

1    common factor, such as common victims, common accomplices,

2    common purpose, and a similar modus operandi.

3           Here, we have no victims, but we have common

4    accomplices, a common purpose, a similar modus operandi.  As to

5    each of these incidents, the defendant was using

6    Mr. Washington as a courier to make routine and repeated trips

7    to transport drugs to Mr. Taylor.  And when Mr. Washington was

8    not able to make the trips, Mr. Nelson made some himself and

9    delivered drugs to Mr. Taylor's apartment.  That's where the

10   drugs were being distributed out of once they arrived, based

11   upon the items that were found as part of the search warrant,

12   the scales, I think there were cutting agents, I believe, were

13   found, and then the firearm, of course, as well.  So,

14   obviously, that was where the drugs, once they were received,

15   were being prepared for distribution, if not actually being

16   distributed out of there.

17          The money was transported back by Mr. Washington or

18   sent via MoneyGram through these female intermediaries,

19   anywhere from two to four or five the evidence would support.

20   That was corroborated by the MoneyGram subpoena.  So we do have

21   a common set of accomplices, a common purpose, to transport and

22   then distribute large quantities of drugs, and a similar modus

23   operandi.  This was also the same course of conduct because the

24   different incidents were sufficiently connected or related to

25   each other to warrant a conclusion that they were part of a

1    single episode spree or ongoing series of offenses.

2             Here, the relevant factors that support this

3    conclusion that the conduct was highly similar to the offense

4    of conviction in the sense that what led, ultimately, to the

5    defendant's arrest was the stop of Mr. Washington while he was

6    in the course of transporting drugs.  So they are all very

7    similar offenses or conduct.  It was regular and repetitious,

8    and occurred over a relatively short period of time in 2017

9    based upon the evidence of record.

10            So for those reasons, the defendant is responsible

11   for acts and omissions of others; not just his own conduct, but

12   acts and omissions of others that were within the scope of this

13   jointly undertaken criminal activity, that were in furtherance

14   of this activity, and that were reasonably foreseeable to him

15   in connection with that activity, and that occurred during the

16   commission of the offense, in preparation for the offense, or

17   in the course of pursuing that offense.

18            So with respect to offenses of that nature involving

19   contraband, in the case of jointly undertaken activity, all

20   quantities that were involved in transactions carried out by

21   other participants that were within the scope of, in

22   furtherance of, or reasonably foreseeable to the defendant are

23   properly counted under the doctrine of relevant conduct, which

24   is not limited to the count of conviction.

25            So in this case, based upon the record, the Court is

1   of the view that the defendant is properly held accountable for

2   the conduct of his co-conspirators in this case, or

3   codefendants, Mr. Washington and Mr. Taylor.

4           For that reason, the Court is of the view that the

5   drug quantities themselves in this case were properly

6   calculated as set forth in the presentence report and in the

7   addendum.  The defendant was held responsible for the heroin

8   that was seized which constitutes the count of conviction, and

9   for methamphetamine that was also seized in connection with

10  these related activity -- this related activity, and the drugs

11  that were supplied by Mr. Nelson to Taylor.  The Court finds

12  those quantities are all properly calculated, and the base

13  offense level is correct based upon the evidence of record in

14  this case.

15          Turning to the objection regarding the importation of

16  the methamphetamine.  The evidence is that given the purity

17  level of this methamphetamine, that it was imported.  There are

18  no known labs in the United States within the knowledge of the

19  DEA.  And this is what they do, they know this sort of thing,

20  that such drugs can be produced here in the United States.  So

21  the methamphetamine in this case was imported, or the drugs

22  were imported, which supports the two-level enhancement under

23  Section 2D1.1(b)(5).  And that's also corroborated by some of

24  the other evidence, the circumstances under which

25  Mr. Washington was having to return to Texas and to pick up the

1    drugs, and having, on one occasion, to wait for someone to

2    bring the drugs to the defendant in a parking lot, a Hispanic

3    individual.  All of that taken together supports the conclusion

4    that the importation enhancement was appropriate in this case.

5           The next objection that the Court will address is the

6    firearm objection.  In this case, the Court is of the view that

7    the addendum to the presentence report very thoroughly and

8    appropriately addresses this issue, and that the enhancement

9    applies whether or not the defendant actually knew that

10   Mr. Taylor actually possessed the firearm because it was

11   reasonably foreseeable to him that Taylor would possess a

12   firearm in connection with the drugs that Nelson was supplying.

13   This was regular activity, large quantities of drugs being

14   delivered and then distributed out of Mr. Taylor's apartment,

15   as evidenced by the other items that were seized at the time.

16   And when the firearm is possessed, and there's no evidence that

17   Mr. Taylor did not possess it, it is properly counted unless it

18   is clearly improbable that the weapon was connected to the

19   offense.  There's been no showing that it's clearly improbable

20   that the weapon was connected.

21          There are certain cases which the probation office

22   has cited in the addendum, *U.S. versus Garza*, *U.S. v. Sparks*,

23   *U.S. v. Aguilera-Zapata,* which all speak to the question of

24   allowing a court or saying a district court can infer that a

25   defendant should've seen -- foreseen a codefendant's possession

1   of a weapon, such as a firearm, if the government shows that

2   another participant, in this case Mr. Taylor, possessed the

3   firearm in the course of committing the offense.

4        And furthermore, it was -- it is reasonably

5   foreseeable, according to the Fifth Circuit, that firearms are

6   employed as tools of the drug trafficking trade.  So the Court

7   finds that that enhancement is also properly applied.

8        Finally, with respect to the leadership enhancement,

9   that pertains to Section 3B1.1 of the guidelines.  Here, the

10  defendant was assessed a four-level enhancement under 3B1.1A,

11  which states that, if the defendant was an organizer or leader

12  of a criminal activity that involved five or more participants

13  and was otherwise extensive, increase by four levels.

14        Well, here the activity clearly involved five or more

15  participants:  The defendant, Mr. Washington, Mr. Taylor, and

16  at least two, probably more females, who were helping with the

17  transfer of the money.  All of those individuals would qualify

18  as participants because they would be criminally responsible in

19  some way for commission of the offense even if they have not

20  been convicted.  Essentially, the other individuals were

21  engaging in money laundering to hide this conduct.

22        In order for the enhancement to apply, according to

23  the Application Note 2, the defendant must have been an

24  organizer, leader, manager or supervisor of one or more

25  participants.  Here, the evidence easily supports the

1    conclusion that he supervised at least Mr. Washington, had him

2    running drugs for him.  He was Mr. Nelson's courier, so he

3    supervised or controlled at least one other individual.

4          Section 3B1.1 also makes it clear in the application

5    notes that there can be more than one leader or organizer.  So

6    if, in fact, Mr. Taylor was also a leader or organizer, that

7    does not prevent application of this enhancement because there

8    can be more than one.

9          The Court should look at a number of factors in

10   evaluating whether this enhancement applies, and those are set

11   forth in Application Note 4.  They include the exercise of

12   decision-making authority, the nature of participation in the

13   commission of the offense, the recruitment of accomplices, the

14   claimed right to a larger share of the fruits of the crime, the

15   degree of participation and planing or organizing the offense,

16   the nature and scope of the activity, and the degree of control

17   and authority exercised over others.

18         Here, the defendant clearly exercised some

19   decision-making authority in terms of the manner in which the

20   drugs would be transported and distributed.  He was heavily

21   involved in committing the offense.  He recruited, or certainly

22   had control or authority over, Mr. Washington and had him doing

23   the transporting, most of the transporting for him.  He was

24   involved in planning and organizing the offense, and the scope

25   of it was significant, involved a number of individuals over a

1    period of time and large quantities of drugs.

2           So based on all of that, the Court is of the view

3    that the sentencing guidelines as set forth in the presentence

4    report are properly calculated.  The defendant's objections are

5    overruled.

6           I would further note that in the addendum the

7    probation office removed acceptance of responsibility from the

8    defendant because the Court finds and agrees that the

9    defendant, although he did plead guilty, has frivolously denied

10   relevant conduct, particularly his connection with

11   Mr. Washington and Mr. Taylor.  That is conduct inconsistent

12   with acceptance of responsibility, and the Court finds that the

13   three-level reduction was appropriately withheld.

14          So based on all of that, the guideline computations

15   would be as follows:  The offense level would be a 43.  The

16   criminal history category is a four.  The guideline range would

17   be life in prison; however, based upon the count of conviction,

18   there is a statutory cap of 240 months, therefore the guideline

19   range is 240 months.  Supervised release range is three years.

20   The defendant is not eligible for probation.  Fine range is

21   $50,000 to $1 million.  Community restitution is applicable.

22   And there's a $100 special assessment.

23          Do the parties agree that those are the correct

24   guideline computations?

25          **MS. VAN BUSKIRK:**  Yes, Your Honor.

1          **MR. DAVIS:**  Yes, Your Honor.

2          **THE COURT:**  Based on the Court's rulings.  The Court

3     agrees and will adopt those as the guideline computations in

4     this matter.

5          The Court will also adopt the presentence report and

6     addendum as the Court's findings of fact subject to the

7     additional findings made here today.

8          I would also observe, just for purposes of the

9     record, that even if the Court had sustained all of the

10    objections, of course except for the drug quantity calculation,

11    the defendant would've been still at an offense level of 38

12    with a history of four, he still would've been over 20 years on

13    the guideline range.  And even if he had received acceptance of

14    responsibility, that would've knocked him down to a 35 and a

15    four.  The bottom of his guideline range would be 235 months,

16    five months below the statutory cap.

17         So for the record, the Court has addressed the

18    objections.  With the exception of the drug quantity

19    calculation, I'm not sure how much the rest of them really

20    affected the guidelines in the sense that he would still have

21    been at or over the statutory cap.

22         At this time, Mr. Nelson, you have what's known as

23    the right of allocution.  That's your opportunity to address

24    the Court and say anything you would like to say on your own

25    behalf before the Court imposes a sentence.  You may address

1   the Court yourself if you wish.  If you would rather your

2   attorney speak for you, that's fine, too.  It is your choice.

3   But either way, I'm going to ask you both to come up -- all

4   three of you to come up here to the podium.  And if you do

5   choose to speak, I remind you that you are under oath.  So if

6   there's anything you would like to say, I'll hear from you at

7   this time, sir.

8            **DEFENDANT:**  I would just like to apologize to the

9   Court, Your Honor, and to my family, and just ask that you have

10   mercy on me.

11            **THE COURT:**  All right.  Anything else, Counsel?  Mr.

12   Davis?  Mr. Barnett?

13            **MR. DAVIS:**  I don't know if Mr. -- I have nothing

14   else to say, Your Honor.

15            **THE COURT:**  Mr. Barnett?

16            **MR. BARNETT:**  Nothing, Your Honor.

17            **THE COURT:**  Anything else from the government?

18            **MS. VAN BUSKIRK:**  No, Your Honor.

19            **THE COURT:**  I believe the government had agreed to

20   recommend a sentence in the lower 50 percent; is that right?

21            **MS. VAN BUSKIRK:**  That is correct, Your Honor.

22            **THE COURT:**  Does the government so recommend?

23            **MS. VAN BUSKIRK:**  Yes, Your Honor.

24            **THE COURT:**  Of course, for the record, that

25   recommendation is moot because the guideline range is 240

1    months, but I will accept it for purposes of the record.

2              One other thing I need to explain to you, Mr. Nelson,

3    is that as part of your plea agreement in this case you waive

4    the right to appeal your conviction and your sentence.  If for

5    some reason you decided that you wanted to try to appeal

6    anyway, you can ask your attorneys to file a notice of appeal

7    for you.  If for some reason they cannot or will not, you can

8    file it yourself.  All you have to do is write on a piece of

9    paper that you wish to appeal, sign it, and mail it in to the

10   clerk of court.  But you only have 14 days to do that from the

11   date I enter a written judgment in your case.  Do you

12   understand that?

13             **DEFENDANT:**  Yes, sir.

14             **THE COURT:**  Also, if for some reason you could not

15   afford to pay the costs of an appeal, you can request

16   permission to proceed on appeal without the payment of costs,

17   but, again, you have to put that request in writing and send it

18   in to the clerk of court.  Do you understand that?

19             **DEFENDANT:**  Yes, sir.

20             **THE COURT:**  This matter, then, is before the Court

21   for sentencing.  In this case, I've considered the record in

22   this matter, the presentence investigation report, and the

23   advisory sentencing guideline computations, and the record of

24   this proceeding here today.  I must also take into account the

25   relevant statutory sentencing factors set forth by Congress at

1     Title 18, United States Code, Section 3553.  And in this case,

2     I find the following factors are relevant:  The nature and

3     circumstances of the offense, and the history and

4     characteristics of the defendant.

5              This was a serious and significant offense involving

6     the transportation and distribution of large quantities of

7     drugs to this area over an extended period of time.  The

8     defendant was in a criminal history category of a four, and was

9     on parole at the time of the offense.  He was an organizer and

10    leader of this offense, and so that is significant in the

11    Court's view.  This is a serious offense.  As the Court stated,

12    it occurred repeatedly over a period of time, involved a number

13    of individuals, efforts to conceal the money, and involved

14    drugs that had been imported and then shipped across state

15    lines.

16             The sentence needs to promote respect for the law.

17    The defendant's criminal history and conduct in this case show

18    a lack of respect for the law.  And it needs to afford a just

19    punishment, one that is sufficient but not greater than

20    necessary to accomplish the goals of sentencing.

21             In this case, the Court would observe that Mr. Nelson

22    has benefited significantly from the plea agreement in this

23    case for being allowed to plea to the count of conviction,

24    Count 2.  And his counsel certainly did a fine job of

25    representing him in that regard to negotiate that plea.  Were

1    it not for the agreement they worked out for him, he would be

2    potentially looking at life in prison, but instead he is facing

3    a maximum exposure of 240 months.  So that is a significant

4    limitation on his sentencing exposure based upon the plea

5    agreement.

6         The sentence needs to afford adequate deterrence to

7    criminal conduct.  Mr. Nelson has not been deterred from

8    engaging in this type of behavior, and he needs to be deterred,

9    but it also needs to deter others who may be inclined to engage

10   in this behavior.  It needs to protect the public from further

11   crimes of this defendant.  This type of conduct is a threat to

12   public health and safety.  The distribution of these drugs is

13   dangerous and presents a threat to public safety.

14        Further, the defendant is in need of correctional

15   treatment in the most effective manner.  He has some documented

16   substance abuse issues with marijuana, opiates and PCP.  The

17   Court will attempt to fashion some conditions that will

18   hopefully assist him in dealing with those substance abuse

19   problems.

20        So based on all of that, the Court will impose

21   sentence as follows:  Having considered the advisory sentencing

22   guideline calculations and the other sentencing factors found

23   at Title 18, United States Code, Section 3553(a), it is the

24   judgment of the Court that the defendant, Ambrose DeJuan

25   Nelson, is hereby committed to the custody of the Bureau of

1   Prisons for a term of 240 months as to Count 2 of the

2   indictment.   The Court is of the view this is an appropriate

3   sentence based upon the guideline range in this case and based

4   upon the 3553 factors as the Court has discussed them here

5   today.

6           It is further ordered that the defendant pay a fine

7   of $25,000 to the United States, which is payable immediately

8   and during the term of incarceration.   The fine is a departure

9   below the guideline range.   It's based upon the defendant's

10  ability to pay.   Given the length of time he will be

11  incarcerated, he will have the ability to work some of the fine

12  off.   This will help defray some of the costs of incarceration,

13  and will also serve as an incentive to obtain employment and

14  remain employed once he is on supervised release, affording

15  probation an additional tool for supervising him.

16          Upon release from custody, any unpaid balance on the

17  fine shall be paid at a rate of $150 per month beginning 30

18  days after release from confinement.   The Court finds that the

19  defendant does not have the ability to pay interest on the

20  fine.   The Court will waive the interest requirement in this

21  case.   In the event the full amount is not paid in full prior

22  to the termination of supervised release, the defendant is

23  ordered to enter into a written agreement with the Financial

24  Litigation Unit of the U.S. Attorney's Office for payment of

25  the remaining balance.

1          In addition, the value of any future discovered

2    assets may be applied to offset the criminal monetary

3    penalties.  The defendant may be included in the Treasury

4    Offset Program, allowing qualified federal benefits to be

5    applied to offset the balance of criminal -- to offset the

6    balance of criminal monetary penalties.

7          Upon release from imprisonment, the defendant shall

8    be placed on supervised release for a term of three years as to

9    Count 2 of the indictment.  Within 72 hours of release from the

10   custody of the Bureau of Prisons, the defendant shall report in

11   person to the Probation Office in the district to which he is

12   released.

13         The Court is of the view that a three-year term of

14   supervised release is appropriate in this case given the nature

15   and circumstances of this offense, and the history and conduct

16   of the defendant, and his criminal history, to maximize a

17   period of time over which probation can supervise the

18   defendant, to facilitate his successful rehabilitation and

19   reintegration into society, and to ensure that he does not

20   recidivate.

21         While on supervised release, the defendant shall

22   comply with the mandatory and standard conditions which are

23   listed on the judgment and commitment order, and he shall not

24   possess a firearm.  In addition, the following special

25   conditions are imposed:

1          Number one, the defendant shall provide the probation

2     office with access to any requested financial information.

3          Number two, the defendant shall not incur new credit

4     charges or open additional lines of credit without the approval

5     of the probation office unless the defendant is in compliance

6     with the installment payment schedule.

7          These two conditions are imposed in light of the fine

8     imposed in this case, to ensure the defendant remains in

9     compliance with that provision of the sentence, and to

10    facilitate probation office supervision regarding the same.

11         Number three, the defendant shall participate in a

12    program of testing and/or treatment for drug abuse as directed

13    by the probation office.  If enrolled in a drug treatment

14    program, the defendant shall abstain from consuming alcoholic

15    beverages during treatment, and shall continue abstaining for

16    the remaining period of supervision.  The defendant shall

17    contribute to the cost of the treatment in accordance with the

18    probation office co-payment policy.

19         Number four, the defendant shall not possess, ingest

20    or otherwise use a synthetic cannabinoid or other synthetic

21    narcotic unless prescribed by a licensed medical practitioner

22    for a legitimate medical purpose.

23         Number five, in the event the defendant resides in or

24    visits a jurisdiction where marijuana or marijuana products

25    have been approved, legalized or decriminalized, the defendant

 1   shall not possess, ingest or otherwise use marijuana or

 2   marijuana products unless prescribed by a licensed medical

 3   practitioner for a legitimate medical purpose.

 4        These three conditions are imposed in light of the

 5   documented issues the defendant has had with substance abuse,

 6   particularly marijuana, PCP and opiates, as set forth in the

 7   presentence report.  Hopefully, these conditions will afford

 8   him some assistance in dealing with that issue and assist him

 9   in reintegrating into society and rehabilitating.

10        Further, because synthetic cannabinoids and synthetic

11   narcotics are often used as substitutes for marijuana, the

12   prohibition on their use is also included.

13        Number six, the defendant shall submit his person,

14   property, house, residence, vehicle, papers, electronic

15   communication devices or office to a search conducted by a

16   United States Probation Officer.  Failure to submit to a search

17   may be grounds for revocation of release.  The defendant shall

18   warn any other occupants that the premises may be subject to

19   searches pursuant to this condition.  An officer may conduct a

20   search pursuant to this condition only when reasonable

21   suspicion exists that the defendant has violated a condition of

22   his supervision and that the areas to be searched contained

23   evidence of this violation.  Any search must be conducted at a

24   reasonable time and in a reasonable manner.

25        This condition is imposed in light of the nature and

1    circumstances and facts surrounding this case, the defendant's

2    criminal history, and pattern of conduct.  The Court is of the

3    view that this condition will assist probation in ensuring the

4    defendant does not recidivate while he is on supervision.

5            The Court recognizes that community restitution is

6    applicable; however, the Court will not order community

7    restitution based upon the defendant's inability to pay in

8    light of the fine imposed in this case.

9            It is further ordered that the defendant pay a

10   mandatory special assessment of $100, which is due immediately.

11           Further, pursuant to Title 21, United States Code,

12   Section 862, the defendant shall be deemed ineligible for any

13   and all federal benefits for a period of one year.  The Court

14   recommends that the defendant be allowed to participate in any

15   substance abuse treatment programs for which he may be eligible

16   while in the custody of the Bureau of Prisons.

17           The Court further recommends that he be housed in a

18   facility closest to his home for which he is eligible to

19   facilitate family visitation.

20           The defendant is remanded to the custody of the U.S.

21   Marshals Service to await designation by the Bureau of Prisons.

22   That will be the judgment of the Court.  Anything further?

23           **MS. VAN BUSKIRK:**  Pursuant to the plea agreement, the

24   government moves to dismiss Count 1 of the indictment.

25           **THE COURT:**  That motion will be granted.  Anything

1    else?

2              **MS. VAN BUSKIRK:**  Nothing.

3              **MR. DAVIS:**  Nothing from the defendant, Your Honor.

4              **THE COURT:**  Defendant is remanded to custody.

5    Counsel, you are excused.

6                        (HEARING CONCLUDED)

7                              -  -  -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    CERTIFICATE OF COURT REPORTER

3

4            I, Sherri L. Penny, RPR, Official Court Reporter for

5    the United States District Court for the Southern District of

6    Mississippi, appointed pursuant to the provisions of Title 28,

7    United States Code, Section 753, do hereby certify that the

8    foregoing is a correct transcript of the proceedings audio

9    recorded and transcribed by me using the audio recording made

10   in this matter, and that same is a true and correct transcript

11   to the best of my ability and understanding.  Any inaudibles

12   that occur in the transcript are a result of the poor recording

13   quality of the audio.

14           I further certify that the transcript fees and format

15   comply with those prescribed by the Court and the Judicial

16   Conference of the United States.

17

18

19

20                    *S/ Sherri L. Penny*
                      Sherri L. Penny, RPR, FCRR
21                    OFFICIAL COURT REPORTER

22

23

24

25